UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V., <br><br>*Plaintiff*, <br><br>v. <br><br>UNITED STATES, <br><br>*Defendant*, <br><br>and <br><br>NUCOR TUBULAR PRODUCTS INC. and ATLAS TUBE AND SEARING INDUSTRIES, <br><br>*Defendant-Intervenors*. | Court No. 20-00166 <br> Hon. Timothy C. Stanceu, Judge |

## ORDER

Upon consideration of the motion for judgment on the administrative record filed by plaintiff, the responses thereto filed by the defendant and the defendant-intervenors, the administrative record, and all other papers and proceedings herein, it is hereby:

**ORDERED** that the motion is **DENIED**; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination is sustained; and it is further

**ORDERED** that plaintiffs' complaint is **DISMISSED**.

It is **SO ORDERED**.

Dated: _____, 2021     _____
New York, New York                              Hon. Timothy C. Stanceu, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V., <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant*, <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC. and ATLAS TUBE AND SEARING INDUSTRIES, <br><br> *Defendant-Intervenors*. | NON-CONFIDENTIAL <br><br><br> Court No. 20-00166 <br> Hon. Timothy C. Stanceu, Judge |

**DEFENDANT-INTERVENORS ATLAS TUBE AND SEARING INDUSTRIES' RESPONSE IN OPPOSITION TO RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant-Intervenors Atlas Tube and Searing Industries hereby provide their response in opposition to the Rule 56.2 motion for judgment on the agency record of Plaintiff Productos Lamonados de Monterrey S.A. de C.V. ("Prolamsa" or "Plaintiff"). As discussed in the accompanying brief in support of this response, this Court should uphold the final results of the U.S. Department of Commerce ("Commerce") in the 2017-2018 administrative review of the antidumping duty order on heavy-walled rectangular welded carbon steel pipes and tubes ("HWR") from Mexico because it is supported by substantial evidence and otherwise in accordance with law. *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Final Results of Antidumping Duty Administrative Review and Final Determination of*

*No Shipments; 2017-2018*, 85 Fed. Reg. 41,962 (Dep't Commerce Jul. 13, 2020) and accompanying Issues and Decision Memorandum.

    Atlas Tube and Searing Industries respectfully request that this Court deny Prolamsa's motion and affirm Commerce's final determination.

                                                     Respectfully submitted,

                                                    <u>/s/ Christopher T. Cloutier</u>
                                                   Roger B. Schagrin
                                                   Christopher T. Cloutier
                                                   Luke A. Meisner
                                                   Kelsey M. Rule
                                                   SCHAGRIN ASSOCIATES
                                                   900 7th Street NW, Ste. 500
                                                   Washington, D.C. 20001
                                                   (202) 223-1700

                                                   *Counsel to Defendant-Intervenors Atlas Tube and*
                                                   *Searing Industries*

May 4, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V., <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant*, <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC. and ATLAS TUBE AND SEARING INDUSTRIES, <br><br> *Defendant-Intervenors*. | NON-CONFIDENTIAL <br><br><br> Court No. 20-00166 <br> Hon. Timothy C. Stanceu, Judge <br><br><br> Business Proprietary Information Deleted from Pages 4 & 5 |

**DEFENDANT-INTERVENORS ATLAS TUBE AND SEARING INDUSTRIES' RESPONSE IN OPPOSITION TO RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

> Roger B. Schagrin
> Christopher T. Cloutier
> Luke A. Meisner
> Kelsey M. Rule
> SCHAGRIN ASSOCIATES
> 900 7th Street NW, Ste. 500
> Washington, D.C. 20001
> (202) 223-1700
>
> *Counsel to Defendant-Intervenors Atlas Tube and Searing Industries*

May 4, 2021

**TABLE OF CONTENTS**

I.    STATEMENTS PURSUANT TO USCIT RULE 56.2(C) ................................... 1

    A.   ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED ........................................................................................ 1

    B.   QUESTION PRESENTED AND SUMMARY OF ARGUMENT ............. 1

II.   STATEMENT OF FACTS ................................................................................ 2

III.  ARGUMENT ..................................................................................................... 6

    A.   STANDARD OF REVIEW ....................................................................... 6

    B.   CONGRESS HAS AFFORDED COMMERCE SIGNIFICANT DISCRETION TO DETERMINE WHETHER SALES ARE MADE AT THE SAME LEVEL OF TRADE ................................................................ 6

    C.   COMMERCE CORRECTLY DETERMINED THAT PROLAMSA'S HOME MARKET SALES WERE MADE AT A SINGLE LEVEL OF TRADE ........................................................................................................ 9

IV.   CONCLUSION ................................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197 (1938) ............................................................. 6

*Consolo. V. Fed. Mar. Comm'n*, 383 U.S. 607 (1966). .................................................................. 6

*Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018).............. 9, 10

*Pasta Zara SpA v. United States*, 781 F. Supp. 2d. 1297 (Ct. Int'l Trade 2011).......................... 10

*Timken United States Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) ............................. 8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................................................... 6

19 U.S.C. § 1673............................................................................................................................. 6

19 U.S.C. §1677(25)....................................................................................................................... 7

19 U.S.C. § 1677(25)(A)................................................................................................................. 6

19 U.S.C. § 1677b(a)(7)(A). ....................................................................................................... 7, 9

19 U.S.C. § 1677b(a)1(B)(i) ........................................................................................................... 7

**Other Authorities**

Senate Remarks on the Uruguay Round Agreements Act, Congressional Record – Senate, S5516 (Apr. 6, 1995)............................................................................................................................ 8

Statement of Administrative Action Accompanying the Uruguary Round Agreements Act, H.R. Doc. No. 103-3167, 103rd Cong., 2d Sess. (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ........ 7

**Regulations**

19 C.F.R. § 351.412(a)-(b).............................................................................................................. 7

19 C.F.R. § 351.412(c)(2)............................................................................................................... 7

I.  **STATEMENTS PURSUANT TO USCIT RULE 56.2(C)**

   A.  **Administrative Determination Sought To Be Reviewed**

   Plaintiff Productos Laminados de Monterrey S.A. de C.V. ("Prolamsa" or "Plaintiff") seeks review of the final results of the 2017-2018 administrative review of the antidumping duty order on heavy-walled rectangular welded carbon steel pipe and tube ("HWR") from Mexico. *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 41,962 (Dep't Commerce Jul. 13, 2020) (PR 181) ("*Final Results*") and accompanying Issues and Decision Memorandum (Jul. 6, 2020) (PR 173) ("IDM").

   B.  **Question Presented And Summary of Argument**

   **Whether Commerce's determination that Prolamsa's home market sales were made at a single level of trade is supported by substantial evidence and otherwise in accordance with law?**

   Yes. Commerce fairly weighed the record evidence provided by Prolamsa, which did not include quantitative evidence of the type Commerce ordinarily requires in order to make a level of trade adjustment—*i.e.*, quantitative evidence demonstrating that claimed differences in selling activities result in a predictable pattern of price differences between sales at different levels of trade. Additionally, the qualitative evidence provided by Prolamsa did not clearly demonstrate that activities performed for one sales channel did not also inure to the benefit of other sales channels, and did not demonstrate that certain selling activities correlated to pricing differences. Therefore, Commerce's determination to deny Prolamsa's claimed level of trade adjustment and find that its home market sales occurred at the same level of trade is supported by substantial record evidence and otherwise in accordance with law.

II.     STATEMENT OF FACTS

In the underlying administrative review, Commerce preliminarily found that Prolamsa's home market sales were made at two different levels of trade ("LOTs"). *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 Fed. Reg. 63,310 (Dep't Commerce Nov. 18, 2019) (PR 155) ("*Preliminary Results*") and accompanying Preliminary Decision Memorandum (PR 147) ("PDM") at 13-16.

In the final phase of the review, Prolamsa failed to adequately support its claims that its home market sales were made at separate LOTs. Specifically, Prolamsa mischaracterized its home market sales and exaggerated the difference between its various channels of distribution in an effort to justify separate home market LOTs. In fact, as Prolamsa itself stated in its original Section A questionnaire response, "{t}he sales process for all channels of distribution within the home and US markets is essentially the same." *Prolamsa Section A Questionnaire Response* (Mar. 15, 2019) (CR 22—CR 37) ("*Prolamsa AQR*") at A-24.

In the preliminary phase of the review, Prolamsa described its U.S. and home market sales as being made at distinct LOTs and reported two LOTs in its home market sales database— "HMLOT 1" and "HMLOT 2." *Prolamsa Section B and C Questionnaire Response* (Apr. 8, 2019) (CR 56—CR 130) ("*Prolamsa BCQR*") at B-34. Prolamsa further reported that it made sales through four channels of distribution in the home market: HM Channel 1, HM Channel 2, H M Channel 3, and HM Channel 4. *Prolamsa AQR* at A-17—A-18. Prolamsa explained that HM Channels 1-3 primarily served its commercial distributor or non-OEM customers, whereas HM Channel 4 primarily served its industrial or OEM customers. *Id*; *Prolamsa BCQR* at B-20.

Prolamsa also reported one constructed export price ("CEP") LOT in the U.S. market—"US LOT 1"—which is comprised of two channels of distribution in the U.S. market: US Channel 2 and US Channel 3. *Prolamsa BCQR* at C-28—C-29; *Prolamsa AQR* at A-25. In a supplemental response, Prolamsa unilaterally amended its U.S. sales database to specify two separate LOTs in the U.S. market—"USLOT 1" and "USLOT 2." *Prolamsa First Supplemental Section C Questionnaire Response* (Oct. 23, 2019) (CR 261—CR 263) ("*Prolamsa 1st SCQR*") at 25 ("In its initial US sales database, Prolamsa mistakenly coded all sales in Field LOTU as '1'"). *See also Prolamsa BCQR* at C-28 ("We have reported one level of trade ('LOT') in the US market.").

In advocating for separate LOTs for its home market sales, Prolamsa relied heavily on its own descriptions of its selling activities and failed to provide sufficient contemporaneous documentation to support its assertions. Accordingly, Commerce instructed Prolamsa to provide such supporting documentation in a supplemental questionnaire. *Prolamsa Section A Supplemental Questionnaire Response* (Oct. 16, 2019) ("*Prolamsa ASQR*") (CR 203—CR 209) at 7-22. However, for several of its reported home market selling activities, Prolamsa failed to provide any supporting documentation. *See generally id.* In particular, Prolmansa provided no supporting documentation and minimal additional narrative regarding the extent to which it directed external sales personnel or sales agents for its home market sales and the degree to which it maintained inventories and distribution warehouses for post-sale or regional warehousing. *Id.* at 12-13, 17-18, Exhibit Supp. A-7.[1] Regarding the intensity level at which

---

[1] Although Prolamsa noted that it changed the name of the selling activity from "Post-Sale Warehousing" to "Regional Warehousing" it its selling activities chart, it failed to provide any documentation to support the reported difference in this activity among its various home market channels of distribution.

3

Prolamsa provided or performed market research, personnel training, order input processing, freight and delivery, just-in-time delivery, and after sales services, the only supporting documentation that Prolamsa provided were non-verifiable declarations from various company officials. *See id* at 11-21, Exhibit Supp. A-6. Thus, for these six reported selling functions, the only supporting documentation Prolamsa provided to corroborate its narrative description of these activities was further narrative description of these activities. At the close of the record in this review, for over half of Prolamsa's home market selling activities, Prolamsa provided either no supporting documentation or merely its own narrative descriptions to support its reported levels of intensity.

The documentation provided by Prolamsa to support its reported home market selling activities included sales and marketing documentation that did not adequately distinguish between industrial and commercial sales. *Prolamsa ASQR* at 8-10, Exhibit Supp. A-5. Prolamsa claimed that the advertising materials prepared for its commercial distributor customers were less complex that the materials prepared for its industrial customers. *Id*. at 8-9. However, these claims were exaggerated and not supported by the advertising materials placed on the record by Prolamsa, which showed that [

]. *Id*. at Exhibit Supp. A-5. In any event, the marketing materials placed on the record by Prolamsa were [

].

Prolamsa made further unsubstantiated distinctions between its sales promotion activities for its commercial and industrial sales, urging Commerce to accept that its most expensive sales events—including "tailored events at international trade shows and expos" and "sponsoring events in conjunction with sporting events"—were somehow limited to promoting sales to

industrial customers. *Prolamsa ASQR* at 10. However, the supporting documentation and explanations provided by Prolamsa [

]. For example, [


]. *Id.* at 10, Exhibit Supp. A-5. Additionally, Prolamsa failed to explain why it hosted [          ] sales events for its <u>home market</u> industrial sales. *Id.* at 10.

Finally, Prolamsa relied heavily on [                              ] and [                              ] documentation to support its description of several of its home market selling activities. *Id.* at 13-15, 19. In particular, Porlamsa relied on this documentation to justify its reported intensity levels for providing engineering services, meeting qualification requirements, and providing technical assistance. *Id*. Commerce relied significantly on Prolamsa's PPAP documentation in preliminarily determining that Prolamsa made home market sales at two LOTs. *PDM* (PR 147) at 14. However, this documentation failed to differentiate between merchandise produced to a specific customer requirement and merchandise sold at a separate LOT.

Petitioners placed on the record rebuttal evidence and substantial briefing demonstrating that Prolamsa's selling activities, when viewed as a whole, do not rise to the level of a "substantial difference" between sales to OEM and non-OEM customers. *Petitioner's Comments on Prolamsa's Section A Questionnaire Responses* (Apr. 23, 2019) (CR 155); *Petitioner's Comments on Prolamsa's Section A-D Questionnaire Responses* (May 7, 2019) (CR 156); *Petitioner's Pre-Prelim Comments* (Nov. 4, 2019) (CR 286); *Petitioner's Case Brief* (Dec. 19, 2019) (CR 304—CR 307).

5

Weighing the record evidence in its *Final Results*, Commerce found that Prolamsa failed to meet its burden to establish eligibility for an LOT adjustment. *IDM* at 27. Specifically, Commerce noted that "none of the documents provided {by Prolamsa} demonstrate direct quantitative support" for its claims that there were significant difference in the selling activities performed between home market channels. *Id*.

### III. ARGUMENT

#### A. Standard Of Review

This Court must uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is defined as "more than a mere scintilla," as well as evidence that a "reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197 (1938). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo. V. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

#### B. Congress Has Afforded Commerce Significant Discretion to Determine Whether Sales Are Made At The Same Level of Trade

Commerce is required to impose antidumping duties on imported merchandise that is sold, or is likely to be sold, in the United States as less than fair value. 19 U.S.C. § 1673. The dumping margin calculated by Commerce is the amount by which the price of the foreign like product sold in the home market—*i.e.*, the "normal value" of the product—exceeds the price charged in the United States. 19 U.S.C. §§ 1673, 1677(25)(A). In order to make a fair comparison between the normal value and U.S. price, certain adjustments are made. For example, the statute directs that, to the extent practicable, Commerce should calculate normal

value based on home market sales "at the same level of trade" as U.S. sales. 19 U.S.C. § 1677b(a)1(B)(i). Neither the statute nor the accompanying Statement of Administrative Action defines the phrase "same level of trade." *See generally* 19 U.S.C. §1677(25); *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103-3167, 103rd Cong., 2d Sess. (1994), reprinted in 1994 U.S.C.C.A.N. 4040. Thus, Congress has afforded Commerce significant discretion to develop its own methodology for determining whether home market and U.S. sales are made at different LOTs.

If Commerce determines that home market sales and U.S. sales are made at a different LOT, the statute directs Commerce to adjust the normal value to account for the difference, but only if that difference:

> (i) involves the performance of different selling activities; and
>
> (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different LOTs in the country in which normal value is calculated.

19 U.S.C. § 1677b(a)(7)(A); *see also* 19 C.F.R. § 351.412(a)-(b).

Commerce's regulations provide that the agency "will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)," and that "{s}ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2). In order to determine whether home market sales are at different stages in the marketing process than the U.S. sales, Commerce examines the channels of distribution in each market and the level of selling expenses for each type of sale. IDM at 24.

Congress has been clear that "there is no requirement for Commerce to make a level of trade or offset adjustment in every case." *Senate Remarks on the Uruguay Round Agreements Act*, Congressional Record – Senate, S5516 (Apr. 6, 1995).

> Indeed, the express language of the statute and the Statement of Administrative Action indicate that there are circumstances where neither adjustment is appropriate or permissible. For example, Commerce may only make {an LOT} adjustment where there are different levels of trade and where that difference is shown to affect price comparability. Commerce's analysis of these issues must be based on the actual circumstances involved.

*Id*.

Commerce's established practice is to consider holistically the selling activities performed in the home market and the seller's marketing scheme as a whole. IDM at 25. Commerce requires that respondents support LOT claims with quantitative evidence in order to demonstrate that differences in prices among various customer categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs (as opposed to some other unrelated factors). *See, e.g., Timken United States Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) (affirming Commerce's determination that respondent failed to provide sufficient record evidence to support its claims that home market sales occurred at different levels of trade). Qualitative evidence, such as narrative descriptions and marketing materials, "does not present a complete understanding of a respondent's selling activities." IDM at 25.

### C. Commerce Correctly Determined That Prolamsa's Home Market Sales Were Made At A Single Level Of Trade

In its motion, Prolamsa argues that Commerce "completely overlooked" quantitative evidence supporting its LOT adjustment claim. *Prolamsa Motion for Judgment on the Agency Record* (ECF 31) at 14. However, the "quantitative evidence" Prolamsa cites relates to "the head count, selling expenses, inventory levels, etc. for its Industrial Sales Group and Commerce sales group…." *Id.* While this information may be considered "quantitative" in the sense that it is expressed numerically, it does not in any way demonstrate that pricing differences between its commercial and industrial sales are attributable to differences in LOTs. In other words, although Prolamsa has identified some differences in selling expenses between its industrial and commercial sales channels, it has not demonstrated that those differences in any way "affect price comparability, based on a pattern of consistent price differences." 19 U.S.C. § 1677b(a)(7)(A). That is the type of quantitative evidence that Commerce requires, and Prolamsa failed to meet its burden to place such evidence on the record in this review.

Moreover, Prolamsa's qualitative evidence fails to clearly demonstrate that the differences in its selling functions justify an LOT adjustment. As noted above, Prolamsa's narrative descriptions overstate the differences between the selling activities performed for its industrial and commercial sales, and the scant documentary evidence provided by Prolamsa does not support its assertions that selling activities performed for one channel do not inure to the benefit of the other. *See generally*, *Prolamsa AQR, Prolamsa ASQR*. Under these circumstances, Commerce reasonably denied Prolamsa's claim.

Commerce has wide discretion to deny respondents' claims that they are entitled to LOT adjustments when record evidence does not clearly demonstrate that differences in selling activities predictably impacts pricing. In *Dillinger France S.A. v. United States*, the court found

9

that Commerce's determination that the respondent's home market and U.S. sales were made at a single LOT was supported by substantial evidence. *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1359 (Ct. Int'l Trade 2018). In the underlying case, the respondent reported that its factories and affiliated service centers performed three distinct selling activities, arguing that these differences were enough to constitute distinct LOTs. *Id*. However, the court found that Commerce "reasonably concluded that the sales activities of the affiliated service centers did not differ substantially enough to merit a separate level of trade." *Id*. Similarly, in *Pasta Zara SpA v. United States*, the court sustained on remand Commerce's determination that the respondent's home market sales occurred at a single LOT. *Pasta Zara SpA v. United States*, 781 F. Supp. 2d. 1297, 1300-04 (Ct. Int'l Trade 2011). In that case, Commerce found that the respondent's home market selling functions generally served both its traditional local customers and its mass-market customers, "and that the selling activities performed solely or principally for the traditional local customers did not establish two distinct LOTs." *Id.* at 1302. Indeed, in its remand redetermination, Commerce "acknowledged that the marketing activities were conducted separately and in many respects were different for each customer group, but it dismissed these distinctions." *Id*. at 1304.

In the instant case, Commerce's determination that Prolamsa's home market sales were made at the same LOT is supported by substantial evidence on the record notwithstanding that the company would prefer the Court to re-weigh the evidence. Prolamsa failed to meet its burden to provide such quantitative evidence that would demonstrate that the differences in its selling activities between its industrial and commercial sales resulted in a consistent pattern of price differences.

## IV.   CONCLUSION

For the foregoing reasons, this Court should uphold Commerce's *Final Results* and reject Prolamsa's Motion for Judgment on the Agency Record.

Respectfully submitted,

/s/ Christopher T. Cloutier
Roger B. Schagrin
Christopher T. Cloutier
Luke A. Meisner
Kelsey M. Rule
SCHAGRIN ASSOCIATES
900 7th Street NW, Ste. 500
Washington, D.C. 20001
(202) 322-1700

*Counsel to Defendant-Intervenors Atlas Tube and Searing Industries*

May 4, 2021

## CERTIFICATE OF COMPLIANCE

      I, Christopher T. Cloutier, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures. The word count for Defendant-Intervenors Rule 56.2 Brief, as computed by the word processing system utilized is 3,512.

/s/ Christopher T. Cloutier  
Christopher T. Cloutier
