Slip Op. No. 21-170

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V.,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>    and<br><br>NUCOR TUBULAR PRODUCTS INC. and ATLAS TUBE AND SEARING INDUSTRIES,<br><br>            Defendant-Intervenors. | Before: Timothy C. Stanceu, Judge<br><br>Court No. 20-00166 |

OPINION AND ORDER

[Remanding for reconsideration an agency decision concluding an administrative review of an antidumping duty order.]

Dated:  December 17, 2021

*David E. Bond*, White and Case LLP, of Washington, D.C., for plaintiffs Productos Laminados de Monterrey S.A. de C.V.  With him on the brief was *Allison J.G. Kepkay*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant the United States of America.  With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistance Director. Of counsel on the brief was *Ayat Mujais*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

    *Alan H. Price*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor Nucor Tubular Products Inc.  With him on the brief were *Robert E. DeFrancesco, III* and *Jake R. Frischknecht*.

    *Christopher T. Cloutier*, Schagrin Associates, of Washington, D.C., for defendant-intervenors Atlas Tube and Searing Industries.  With him on the brief were *Roger B. Schagrin*, *Luke A. Meisner*, and *Kelsey M. Rule*.

    Stanceu, Judge:  In this action brought under Section 516A of the Tariff Act of 1930, *as amended* (the "Tariff Act"), 19 U.S.C. § 1516a,[1] plaintiff Productos Laminados de Monterrey S.A. de C.V. ("Prolamsa") contests a final determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") that concluded the second administrative review of an antidumping duty order on certain heavy walled rectangular carbon welded steel pipes and tubes from Mexico ("HWR," "HWRT," or the "subject merchandise").

    Before the court is Prolamsa's motion for judgment on the agency record, brought under USCIT Rule 56.2, in which it claims that Commerce erred in denying its request for a level-of-trade adjustment related to the subject merchandise that it sold in its home market of Mexico.  Opposing the motion are defendant United States and defendant-intervenors Nucor Tubular Products Inc. ("Nucor") and Atlas Tube and Searing Industries.  Ruling that the Department's decision to deny Prolamsa's request for a level-of-trade adjustment in the Final Results relied upon a factual finding that is

---

[1] All citations to the United States Code herein are to the 2018 edition and all citations to the Code of Federal Regulations herein are to the 2020 edition.

not supported by substantial evidence on the record of the administrative review and a

second finding that is vague and conclusory, the court grants plaintiff's motion and

remands the contested decision to Commerce for reconsideration.

## I. Background

## A. The Contested Agency Determination

The contested administrative determination (the "Final Results") was published

as *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final*

*Results of Antidumping Duty Administrative Review and Final Determination of No*

*Shipments; 2017–2018*, 85 Fed. Reg. 41,962 (Int'l Trade Admin. July 13, 2020)

("*Final Results*").  The Final Results incorporate by reference a "Final Issues and

Decision Memorandum" containing explanatory discussion.  *Issues and Decision*

*Memorandum for the Antidumping Duty Administrative Review: Heavy Walled Rectangular*

*Welded Carbon Steel Pipes and Tubes from Mexico; 2017-2018* (Int'l Trade Admin. July 6,

2020) (P.R. 173, J. App. at 530) ("*Final I&D Mem.*").[2]

---

[2] The information disclosed in this Opinion and Order is included in public
versions of record documents, public versions of the parties' submissions, and other
information subsequently made public in issuances by Commerce.  All citations to
record documents are to the public versions of those documents.  All citations to
"J. App." are to the public version of the Joint Appendix (June 25, 2021), ECF No. 47-1
(public).

### B.  The Parties

Plaintiff is a Mexican producer and exporter of the subject merchandise that

participated in the Department's second administrative review.  Compl. ¶ 3 (Sept. 28,

2020), ECF No. 12.  Defendant is the United States.  Defendant-intervenors Nucor and

Atlas Tube and Searing Industries are domestic producers of HWR pipes and tubes.

Consent Mot. to Intervene as a Matter of Right 2 (Oct. 7, 2020), ECF No. 13; Consent

Mot. to Intervene as Def.-Intervenor 1–2 (Oct. 23, 2020), ECF No. 18.

### C.  Proceedings Before Commerce

Commerce issued the antidumping duty order (the "Order") in 2016.  *Heavy*

*Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea, Mexico,*

*and the Republic of Turkey: Antidumping Duty Orders*, 81 Fed. Reg. 62,865 (Int'l Trade

Admin. Sept. 13, 2016) ("*Order*").  In the Order, Commerce described the subject

merchandise as "certain heavy walled rectangular welded steel pipes and tubes of

rectangular (including square) cross section, having a nominal wall thickness of not less

than 4 mm." *Id*. at 62,865.  These products, which typically are supplied in lengths,

commonly from 20 to 42 feet, to manufacturers who further process them, "are used in

construction for support and for load-bearing purposes, as well as in transportation,

farm, and material handling equipment." *Heavy Walled Rectangular Welded Carbon Steel*

*Pipes and Tubes from Korea, Mexico, and Turkey*, Inv. Nos. 701-TA-539, 731-TA-1280-1282,

USITC Pub. 4633, at I-12 (Sept. 2016) (Final).

On November 15, 2018, Commerce initiated the second administrative review of

the Order, which covered entries made during the period of September 1, 2017 to

August 31, 2018 (the "period of review" or "POR"). *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 57,411, 57,413 (Int'l Trade

Admin.). Commerce chose Prolamsa and a second exporter/producer, Maquilacero S.A.

de C.V., as "mandatory" respondents, i.e., respondents for which Commerce intended

to conduct an individual examination of sales and determine individual dumping

margins, for the review. *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes*

*from Mexico; Selection of Respondents for Individual Review* (Feb. 7, 2019) (P.R. 21, at 1,

J. App. at 16).

Commerce published preliminary results for the second review on November 18,

2019 (the "Preliminary Results"), in which Commerce preliminarily calculated a

dumping margin of 0.8% for entries of subject merchandise produced and exported by

Prolamsa. *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico:*

*Preliminary Results of Antidumping Duty Administrative Review and Preliminary*

*Determination of No Shipments; 2017–2018*, 84 Fed. Reg. 63,610 (Int'l Trade Admin.)

("*Preliminary Results*"). Incorporated by reference in the Preliminary Results is an

explanatory document, the "Preliminary Decision Memorandum." *Decision*

*Memorandum for the Preliminary Results of the 2017-2018 Administrative Review of the*

*Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes*

*from Mexico* (Int'l Trade Admin. Nov. 6, 2019) (P.R. 147, J. App. at 479) ("*Prelim. Decision Mem.*"). Commerce preliminarily found that Prolamsa had made sales at two levels of trade ("LOTs") in its home market of Mexico during the period of review and, on that basis, made a level-of-trade adjustment in calculating the 0.8% preliminary dumping margin. *Id.* at 15, J. App. at 483.

On July 13, 2020, Commerce published the Final Results, in which it assigned Prolamsa a weighted average dumping margin of 7.47%. *Final Results*, 85 Fed. Reg. at 41,963. In the Final Results, Commerce, changing its prior position, denied Prolamsa's request for a level-of-trade adjustment upon deciding that Prolamsa sold the foreign like product at a single LOT in its home market. Commerce made two other changes affecting Prolamsa's margin, neither of which Prolamsa contests before the court. *See Final I&D Mem.* at 3, J. App. at 533. Therefore, the Department's decision not to allow a level-of-trade adjustment for Prolamsa is at issue in this litigation.

### D.  Proceedings Before the Court

Plaintiff brought this action in September 2020. Summons (Sept. 1, 2020), ECF No. 1; Compl. (Sept. 28, 2020), ECF No. 12. On March 5, 2021, plaintiff filed the instant motion for judgment on the agency record and accompanying brief. Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 31 (conf.), 32 (public); Mem. of P. & A. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R., ECF Nos. 31-1 (conf.), 32-1 (public) ("Pl.'s Br."). On May 4, 2021, Atlas Tube and Searing Industries filed a response in

opposition to plaintiff's motion.  Def.-Intervenors Atlas Tube and Searing Industries'

Resp. in Opp'n to Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 37 (conf.), 38 (public)

("Atlas Tube's Resp.").  Nucor and the government each submitted their respective

responses on May 7, 2021.  Def.-Intervenor Nucor Tubular Products Inc.'s Resp. Br.,

ECF Nos. 40 (conf.), 41 (public) ("Nucor's Resp."); Def.'s Resp. to Pl.'s Rule 56.2 Mot. for

J. upon the Agency R., ECF No. 42 ("Def.'s Resp.").  On June 11, 2021, Prolamsa filed its

reply brief.  Reply Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R., ECF

No. 45.

On July 2, 2021, plaintiff filed an unopposed motion for oral argument on its Rule

56.2 motion.  Pl.'s Unopposed Mot. for Oral Arg., ECF No. 49.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced

under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting a

final determination that Commerce issues to conclude an administrative review of an

antidumping duty order.

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## B.  Levels of Trade in Calculations of Dumping Margins

Section 751(a)(1) of the Tariff Act requires Commerce, upon a proper request, to conduct a periodic administrative review at least once during each 12-month period beginning on the anniversary of the date of publication of an antidumping duty order. 19 U.S.C. § 1675(a)(1).  In a review, Commerce is directed to make comparisons between the normal value of the subject merchandise and the "U.S. price" (i.e., the "export price" ("EP") or "constructed export price" ("CEP")) and determine the dumping margin for "each entry" of the subject merchandise.  *Id.* § 1675(a)(2)(A)(i), (ii).

The Tariff Act directs that Commerce, in the ordinary instance in which normal value is based on the price of the foreign like product in the home market, determine normal value beginning with the price (often referred to as the "starting price") "at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, *to the extent practicable, at the same level of trade* as the export price or constructed export price."  *Id*. § 1677b(a)(1)(B)(i) (emphasis added).  The statute provides for various types of adjustments to the starting price in the determination of normal value.

One of the types of adjustments to the starting price is known as a "level-of-trade" adjustment, which Commerce must make according to 19 U.S.C. § 1677b(a)(7) under certain conditions.  When calculating normal value, Commerce is required to make an upward or downward adjustment to the starting price "to make due allowance for any difference (or lack thereof) between the export price or constructed export price" and the starting price "(other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value" if both of two conditions are met.  *Id*. § 1677b(a)(7)(A).

The first condition is met if the difference in the level of trade between the export price or constructed export price and normal value "involves the performance of different selling activities."  *Id*. § 1677b(a)(7)(A)(i).  The second condition is met if the difference in the level of trade between the EP or the CEP and normal value "is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined."  *Id*. § 1677b(a)(7)(A)(ii).  The statute provides that "[i]n a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined."  *Id*. § 1677b(a)(7)(A).

The Department's regulations explain that "[i]n comparing United States sales
with foreign market sales [i.e., sales in the comparison market, which typically is the
home market of the exporting country], the Secretary may determine that sales in the
two markets were not made at the same level of trade, and that the difference has an
effect on comparability of the prices," adding that "[t]he Secretary is authorized to
adjust normal value to account for such a difference."  19 C.F.R. § 351.412(a).  The
regulations provide that "[t]he Secretary will determine that sales are made at different
levels of trade if they are made at *different marketing stages (or their equivalent)*."  *Id.*
§ 351.412(c)(2) (emphasis added).  The Commerce regulations do not include a
definition for the term "marketing stages" or the term "equivalent of marketing stages"
in the "definitions" section of the regulations, 19 C.F.R. § 351.102(b).  The preamble to
the Department's 1997 promulgation of the regulations explains that "Section 351.412(c)
states that an LOT is a marketing stage 'or the equivalent' (which means that the
merchandise does not necessarily have to change hands more than twice in order to
reach the more remote LOT)."  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg.
27,296, 27,371 (Int'l Trade Admin. May 19, 1997).  While addressing level-of-trade issues
involving a remote LOT, the preamble instructs that "[s]ubstantial differences in the
amount of selling expenses associated with two groups of sales also may indicate that
the two groups are at different levels of trade," *id.*, but the regulations further provide,
in § 351.412(c)(2), that "[s]ubstantial differences in selling activities are a necessary, but

not sufficient, condition for determining that there is a difference in the stage of marketing." *Id*. It also explains that "[s]ome overlap in selling activities will not preclude a determination that two sales are at different stages of marketing." *Id*.

### C. The Department's Preliminary Determination of Two Levels of Trade in Prolamsa's Home Market Sales and its Level-of-Trade Adjustment to Normal Value

In questionnaire responses it submitted during the review, Prolamsa informed Commerce that its home market sales occurred in four channels of distribution, identifying its sales in what it termed "HM [home market] Channel 4" as sales of custom-designed parts that were made from HWR pipes and tubes and that were produced for, and sold to, original equipment manufacturers ("OEMs"). *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Response to Section A of the Questionnaire* (Mar. 15, 2019) (P.R. 46–56, at A-18, J. App. at 34) ("*Section A Resp.*"). Prolamsa contrasted its HM Channel 4 sales, to which it referred as its "industrial" sales, with those sold through its other three channels of distribution, to which it referred as its "commercial" sales of HWR pipes and tubes, and which it described as follows: direct sales to unaffiliated customers from inventory stored at its plants ("HM Channel 1"); direct sales to unaffiliated customers from inventory stored at its warehouses ("HM Channel 2"); and sales to affiliated resellers, which products subsequently were resold to unaffiliated home market customers ("HM Channel 3"). Pl.'s Br. 7–9.

Prolamsa points to record evidence in arguing that "sales through HM Channel 4 required substantially more selling activities" than did its sales through the other three channels.  Pl.'s Br. 8.

On the issue of price comparability, Prolamsa informed Commerce that its "[h]ome market sales prices did not vary based on whether the HWRT was sold through HM Channel 1, HM Channel 2, or HM Channel 3," that "[h]ome-market sales prices in HM Channel 4 were significantly higher than sales through HM Channel 1, HM Channel 2, and HM Channel 3" and that "[t]he higher prices reflected the significant, additional selling activities performed in relation to sales through HM Channel 4, as well as the additional production costs incurred to manufacture the parts." *Section A Resp.* at A-22, J. App. at 38.

With respect to its U.S. sales of subject merchandise, Prolamsa explained to Commerce during the review that it sold HWR pipes and tubes through three channels of distribution.[3]  Prolamsa argued that all of its U.S. sales were more similar, in terms of

---

[3] Prolamsa had both export price ("EP") and constructed export price ("CEP") sales in the United States during the period of review for the second review.  As stated in the Preliminary Decision Memorandum:

> With respect to the U.S. market, Prolamsa reported that it made sales through three channels of distribution: (1) direct EP sales of HWR pipe and tube to unaffiliated U.S. customers for which Prolamsa knew the final destination was the United States (*i.e.*, U.S. channel 1); (2) direct CEP sales of HWR pipe and tube to unaffiliated U.S. customers from Prolamsa's inventory sold through its U.S. affiliate, Prolamsa, Inc. (*i.e.*, U.S. channel 2); and (3) direct CEP sales of HWR pipe and tube to

(continued . . .)

characteristics and selling functions, to its HM Channels 1, 2, and 3 sales, i.e., its

"commercial" sales, than they were to its "industrial" sales of HM Channel 4.  *Heavy*

*Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Response to Sections B*

*and C of the Questionnaire* (Apr. 8, 2019) (P.R. 69–71, at B-35, J. App. at 202).  Prolamsa

contended that its U.S. sales should be compared to HM Channels 1–3, and that

HM Channel 4 sales should not be used for comparison purposes unless sales in

HM Channels 1–3 are unavailable, and that in such an instance Commerce should make

a level-of-trade adjustment.  *Id.*

    For purposes of calculating the 0.8% preliminary dumping margin for Prolamsa

in the Preliminary Results, Commerce agreed.  Commerce preliminarily determined,

first, that all of Prolamsa's U.S. sales occurred at a single LOT.  *Prelim. Decision*

*Mem.* at 15, J. App. at 483.  It preliminarily determined, next, "that sales to the home

market non-OEM customers (*i.e.*, in HM channels 1 through 3) during the POR were not

made at a different LOT than sales to the United States."  *Id.* at 16, J. App. at 484.

Regarding the requested level-of-trade adjustment, Commerce stated that "[i]n

instances where we were unable to make price-to-price comparisons at the same LOT

_____

(. . . continued)
    unaffiliated U.S. customers sold from Prolamsa Inc.'s warehouse through
    Prolamsa, Inc. (*i.e.*, U.S. channel 3).
*Decision Memorandum for the Preliminary Results of the 2017- 2018 Administrative*
*Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel*
*Pipes and Tubes from Mexico* (Int'l Trade Admin. Nov. 6, 2019) (P.R. 147, at 15, J. App.
at 485).

(*i.e.*, comparisons involving OEM sales in HM channel 4) we made an LOT adjustment."

*Id.*  In summary, for the Preliminary Results Commerce used Prolamsa's HM Channel 4

sales for price comparisons with U.S. sales only when no HM Channel 1, 2, or 3 sales

were available for comparison with U.S. sales, and when it used an HM Channel 4 sale

for that purpose, it made an adjustment, i.e., a reduction, in normal value to account for

the difference in level of trade.

### D.  The Department's Decision in the Final Results to Deny Prolamsa's Request for a Level-of-Trade Adjustment

Following the Department's issuance of the Preliminary Results, Petitioners

Independence Tube Corporation, a Nucor company, and Southland Tube, Inc., a Nucor

company, (the corporate predecessors to defendant-intervenor Nucor) filed a case brief

with Commerce in which they opposed the decision in the Preliminary Results that

would allow Prolamsa a level-of-trade adjustment.  *See Final I&D Mem.* at 16–20,

J. App. at 546–50.  They characterized the difference between HM Channel 4 sales and

the sales in HM Channels 1 through 3 as demonstrating only "minor differences" in the

customer bases and merchandise that they argued did not amount to a different stage of

marketing.  Overall, they argued that Prolamsa provided insufficient, and inadequately

documented, proof for its request that Commerce recognize a second level of trade in its

home market.  In its case brief, Prolamsa made arguments in rebuttal.  *Id*. at 20–23,

J. App. at 550–53.

Commerce, reversing its preliminary decision in the Final Results, stated that
"[b]ased upon the parties' comments and our reexamination of the evidence on the
record, we find that Prolamsa has not demonstrated that it sold HWR pipe and tube at
two different LOTs in the home market." *Id*. at 23, J. App. at 553.  "Accordingly, for
these final results we have treated all sales made in the home market at a single LOT
during the POR." *Id*.

**E.  The Department's Denial of the Requested Level-of-Trade Adjustment Is Not
Supported by Substantial Evidence**

In the Final Issues and Decisions Memorandum, Commerce stated as
background that "reliance on qualitative evidence, such as narrative descriptions of
differences in selling functions, customer correspondence, sample sales records,
meeting presentations and the like, without supporting quantitative evidence
frequently does not present a complete understanding of a respondent's selling
activities." *Final I&D Mem.* at 25, J. App. at 555.  Commerce cited a change of practice
under which "[s]ince 2018, Commerce has required respondents to provide quantitative
evidence in support of their LOT claims." *Id*. at 26, J. App. at 556.  It further explained
that "[s]ignificantly, Commerce's requirement that respondents support LOT claims
with quantitative evidence in all proceedings was implemented in 2018 to enhance
Commerce's ability to determine whether reported differences in selling functions are
substantial enough to warrant a finding that sales were made at different LOTs."
*Id*. at 25, J. App. at 555 (footnote omitted).  Commerce added that "[a]lthough

qualitative information is helpful and relevant to the LOT analysis, reliance on this

information alone limits Commerce's ability to analyze selling functions to determine if

LOTs identified by a party are meaningful and to evaluate whether a respondent's LOT

claims are reasonable and accurate."  *Id.*

      After discussing its general requirement for "quantitative information,"

Commerce based its decision denying Prolamsa's request for a level-of-trade

adjustment on a finding that "[w]hile Prolamsa asserts that it fully demonstrated that

there were significant differences in the selling activities performed between home

market channels during the POR, none of the documents provided demonstrate direct

quantitative support for such claims."  *Id.* at 27, J. App. at 557.  "Therefore, for these

final results, Commerce finds that Prolamsa has not shown that it made sales in the

home market at more than one LOT because it has not supported its LOT claims with

quantitative evidence."  *Id.*

      Before the court, Prolamsa argues that Commerce "completely overlooked the

quantitative information submitted by Prolamsa."  Pl.'s Br. 14.  The court agrees.

Evidence on the record contradicts the Department's finding that none of the

documents Prolamsa provided "demonstrate direct quantitative support" for

Prolamsa's assertion "that there were significant differences in the selling activities

performed between home market channels during the POR."  *Final I&D Mem.* at 27,

J. App. at 557.

With its response to the Department's supplemental Section A questionnaire,

Prolamsa provided quantitative data illustrating differences between the staffing and

expenses it incurred in making its home market "industrial" sales, i.e., its OEM sales of

parts made from HWR pipe and tube in HM Channel 4, and its sales of standard HWR

pipe and tube in the other three channels, to which it referred in the response as its

"commercial" sales. *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from

Mexico: Response to the First Section A Supplemental Questionnaire* (Oct. 21, 2019) (P.R. 135–

37, at 7–8, J. App. at 307–08) (*"Supp. Section A Resp."*).  In columns in Supplemental

Exhibit A-4, Prolamsa presented data for the "Commercial" and "Industrial" sales

activities, broken down by "Total Sales Personnel (Directors, Managers, Staff)

(Headcount)," "Total Selling Expenses (MXN [apparently, 'Mexican'])," and "Sales

Team's Salaries & Benefits (MXN)." *Id.* at Ex. Supp. A-4, J. App. at 325.  Prolamsa

summarized this confidential business data on page 8 of the response. *Id.* at 8,

J. App. at 308.  The data show generally that the industrial sales accounted for staffing

and staffing expenses (salary and benefits) and total selling expenses that, when related

to total home market ("MXN") sales in each of these two categories, were

proportionally higher by a substantial amount than those of the commercial sales. *Id.*

Describing these quantitative data to the court, Prolamsa describes this supplemental

questionnaire response as presenting "comparisons of selling expenses,

salaries/benefits, and headcount, all demonstrating the substantially higher expenses

incurred for sales made through HM Channel 4 due to the higher intensity of selling

activities, such as those required to qualify as a supplier and to coordinate customer-

specific inventory and just-in-time delivery."  Pl.'s Br. 10 (citing *Supp. Section A Resp.*

at 7–8 & Ex. Supp. A-4, J. App. at 307–08 & 325).

     Prolamsa provided a second set of quantitative data on inventory turnover to

illustrate that the industrial sales involved substantially longer average inventory

turnover periods than the commercial sales.  Prolamsa argues that these data "support

the conclusion that the sales through HM Channel 4 had a slower inventory turnover,

which resulted in higher inventory costs, as compared to sales through HM channels

1 through 3" and that "[t]he slower inventory turnover was because of additional

inventory requirements for just-in-time delivery requirements of OEMs and to

compensate for specific customer needs."  Pl.'s Br. 15 (citing *Supp. Section A Resp.* at 17

& Ex. Supp. A-8, J. App. at 317 & 360).

     The Final Issues and Decision Memorandum does not specifically address the

quantitative data on selling expenses and inventory turnover.  Instead, the

Department's analysis proceeds directly from its invalid finding that Prolamsa failed to

provide documents that "demonstrate direct quantitative support" for Prolamsa's

assertion "that there were significant differences in the selling activities performed

between home market channels during the POR."  *Final I&D Mem*. at 27, J. App. at 557.

In addition to that specific finding, Commerce offered only one other finding in support

of its ultimate conclusion.  Referring to its "analytical framework" since the 2018 change

of practice, Commerce concluded that "[i]n applying this analytical framework to the

record evidence, Commerce has reached a different conclusion in the final results of this

review than it reached in the *Preliminary Results* because it has found that the totality of

the record evidence contains inadequate support for Prolamsa's LOT claims."  *Id*. at 27-

28, J. App. at 557–58.  This second finding is unsatisfactory in two respects.  First, it is

entirely conclusory, hiding behind a vague and unexplained "totality of the record

evidence."  Second, the actual "totality of the record evidence" would appear to include

circumstances Commerce described in a number of specific factual findings that

Commerce stated, and grounded in record evidence, in the Preliminary Results but did

not identify in the Final Results as findings that it was reversing or abandoning.

For example, regarding "intensity" of selling activities, Commerce stated in the

Preliminary Results that Prolamsa had "provided certain additional documentation

adequately demonstrating that it performed 9 out of 14 selling activities for its HM

channel 4 sales at a high level of intensity (*i.e.,* personal training/exchange, engineering

services, qualification requirements, order input/processing, inventory maintenance,

freight and delivery, just-in-time delivery, technical assistance, and after-sales

services)."  *Prelim. Decision Mem.* at 14, J. App. at 482 (footnote omitted).  For the

Preliminary Results, Commerce also found that Prolamsa performed certain selling

activities for its "industrial" sales of HM Channel 4, which were sales of custom "HWR

pipe and tube parts," that it did not perform for its other, i.e., "commercial" sales of HM

Channels 1–3, which were of "standard HWR pipe and tube." *Id*. Commerce devoted

detailed discussion in the Preliminary Decision Memorandum to these "OEM-specific

selling activities not performed for the rest of Prolamsa's home market sales." *See id*. In

the Preliminary Decision Memorandum, Commerce stated that "Prolamsa undertakes

significant selling activities when selling HWR pipe and tube parts to OEMs and that

"[b]ecause certain of these OEM-specific selling activities are not performed for the rest

of Prolamsa's home market sales, it is clear that substantial differences inherently exist

between home market sales of standard HWR pipe and tube and HWR pipe and tube

parts." *Id*. Commerce found, specifically, that "[c]ritical to these sales is the successful

completion of the Production Parts Approval Process (PPAP), an industry-specific

qualification process that ensures quality and established processes for OEM customers

to certify manufacturers on a custom-'part' basis." *Id*. (footnote omitted). Commerce

also stated that "Prolamsa provided contemporaneous PPAP documentation

supporting certain activities performed in HM channel 4 that are not performed with

respect to other home market sales." *Id*. "For example, with respect to engineering

services, we find that the PPAP documentation provided is representative" and that

"with respect to technical assistance, Prolamsa provided documentation detailing ways

to re-engineer products or production processes in order to reduce production process

costs as required by an OEM customers [*sic*]." *Id*. (footnote omitted).

In summary, the Department's analysis rests on one finding that is contradicted by the record evidence and another that is vague and conclusory in invoking the "totality of the record evidence."  The court, therefore, must remand for reconsideration the Department's decision that all home market sales occurred at a single LOT and to reject Prolamsa's request for a level-of-trade adjustment.

Defendant argues that the court should sustain the Department's decision on the ground that "in reaching its conclusion that the record evidence was insufficient to support Prolamsa's level of trade claim, Commerce explained in the final results that there was no quantitative evidence that would allow Commerce to determine if Prolamsa's claimed levels of trade were *meaningful*."  Def.'s Resp. 12 (citing *Final I&D Mem.* at 23, 25, J. App. at 553, 555) (emphasis in original).  This is not an accurate paraphrase of the discussion in the Final Issues and Decision Memorandum.  Commerce ruled as it did upon a finding that Prolamsa failed to provide documents that demonstrated direct quantitative support for Prolamsa's assertion that there were significant differences in the selling activities performed between the industrial and the commercial home market sales and upon a conclusion that the totality of the record evidence was insufficient to support a level-of-trade adjustment.

Even were defendant's characterization of the Department's decision correct, the court would not agree with defendant's argument.  The record evidence defendant implies is not "meaningful" includes, *inter alia*, quantitative and qualitative evidence

concerning a number of selling activities that, according to findings in the Preliminary

Results that Commerce did not abandon, uniquely characterized the home market

industrial sales and distinguished them from the other home market sales and the U.S.

sales.  In summary, there is record evidence that sales in HM Channel 4 involved

different and more intense selling activities, a different type of customer (OEMs), and

different products (what Commerce in the Preliminary Results termed custom "HWR

pipe and tube parts") than did the "commercial" sales of HM Channels 1–3 (which were

of "standard HWR pipe and tube").

Defendant-intervenors' arguments parallel defendant's in some respects but also

rest upon certain other findings and conclusions upon which Commerce did not base its

decision.  *See* Nucor's Resp. 11–24; *see also* Atlas Tube's Resp. 9–10.  The court cannot

sustain an agency determination upon *post hoc* reasoning.  *Burlington Truck Lines, Inc. v.*

*United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's

*post hoc* rationalizations for agency action . . .").  Instead, "[t]he grounds upon which an

administrative order must be judged are those upon which the record discloses that

[agency] action was based."  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

### III.  CONCLUSION AND ORDER

Commerce, on remand, must reconsider its decision finding a single home

market level of trade and declining to make a level-of-trade adjustment.  That decision

rests solely upon a factual finding that is not supported by substantial evidence and a

vague and conclusory statement directed to the "totality of the record evidence."

Therefore, upon consideration of all papers and proceedings herein, and upon

due deliberation, it is hereby

**ORDERED** that plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, ECF Nos. 30 (initial conf.) (Mar. 5, 2021), 31 (conf.) (Mar. 8, 2021), 32 (public) (Mar. 8, 2021), be, and hereby is, granted; it is further

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a redetermination upon remand ("Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that plaintiff and defendant-intervenors shall have 30 days from the filing of the Remand Redetermination in which to submit comments to the court; it is further

**ORDERED** that should plaintiff or defendant-intervenors submit comments, defendant shall have 15 days from the date of filing of the last comment to submit a response; and it is further

**ORDERED** that plaintiff's Unopposed Motion for Oral Argument (July 2, 2021), ECF No. 49, be, and hereby is, denied.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated:  December 17, 2021
         New York, New York