Slip Op. No. 22-77

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRODUCTOS LAMINADOS de MONTERREY S.A. de C.V., <br><br>                    Plaintiff, <br><br>          v. <br><br> UNITED STATES, <br><br>                    Defendant, <br><br>          and <br><br> NUCOR TUBULAR PRODUCTS INC., ATLAS TUBE, A DIVISION OF ZEKELMAN INDUSTRIES, AND SEARING INDUSTRIES, <br><br>                    Defendant-Intervenors. | Before: Timothy C. Stanceu, Judge <br><br> Court No. 20-00166 |

## OPINION

[Sustaining an agency determination responding to the court's order in an action contesting results of an antidumping duty proceeding.]

Dated:  July 6, 2022

*David E. Bond*, White & Case, LLP, of Washington, D.C., for plaintiff Productos Laminados de Monterrey S.A. de C.V.  With him on the brief was *Allison J. G. Kepkay.*

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant the United States of America.  With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of

counsel on the brief was *Ayat Mujais*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

    *Alan H. Price*, Wiley Rein, LLP, of Washington, D.C., for defendant-intervenor Nucor Tubular Products Inc.  With him on the brief were *Robert E. DeFrancesco, III*, *Jake R. Frischknecht*, and *Paul A. Devamithran*.

    *Christopher T. Cloutier*, Schagrin Associates, of Washington, D.C., for defendant-intervenors Atlas Tube and Searing Industries.  With him on the brief were *Roger B. Schagrin*, *Luke A. Meisner*, and *Kelsey M. Rule*.

    Stanceu, Judge:  Plaintiff Productos Laminados de Monterrey S.A. de C.V. ("Prolamsa") is a Mexican producer and exporter of heavy walled rectangular carbon welded steel pipes and tubes.  This class or kind of merchandise (referred to herein as "HWR" or "HWRT") is subject to an antidumping duty order issued in 2016.

    This litigation arose from the final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the second periodic administrative review ("second review") of the antidumping duty order (the "Order"), which assigned to Prolamsa a weighted average dumping margin of 7.47%.

    Before the court is a "Remand Redetermination" that Commerce submitted in response to the court's Opinion and Order granting plaintiff's motion for judgment on the agency record.  The Remand Redetermination determined a revised margin of 0.89% for Prolamsa.  Plaintiff supports the Remand Redetermination, and defendant United States requests that the court enter judgment to sustain it.  Defendant-intervenor Nucor Tubular Products Inc. ("Nucor") is opposed.  Defendant-intervenors Atlas Tube,

a Division of Zekelman Industries, and Searing Industries did not submit comments to

the court on the Remand Redetermination and, therefore, have raised no objection to

this result.  The court sustains the Remand Redetermination.

## I. Background

The contested agency determination (the "Final Results") was published as

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Results of*

*Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–*

*2018*, 85 Fed. Reg. 41,962 (Int'l Trade Admin. July 13, 2020) ("*Final Results*").  In the

Order, Commerce described the subject merchandise as "certain heavy walled

rectangular welded steel pipes and tubes of rectangular (including square) cross

section, having a nominal wall thickness of not less than 4 mm."  *Heavy Walled*

*Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea, Mexico, and the*

*Republic of Turkey: Antidumping Duty Orders*, 81 Fed. Reg. 62,865, 62,865 (Int'l Trade

Admin. Sept. 13, 2016) ("*Order*").  These products, which typically are supplied in

lengths, commonly from 20 to 42 feet, to manufacturers who further process them, "are

used in construction for support and for load-bearing purposes, as well as in

transportation, farm, and material handling equipment."  *Heavy Walled Rectangular*

*Welded Carbon Steel Pipes and Tubes from Korea, Mexico, and Turkey*, Inv. Nos. 701-TA-539,

731-TA-1280-1282, USITC Pub. 4633, at I-12 (Sept. 2016) (Final).

In response to Prolamsa's claim, the court issued an Opinion and Order remanding the Final Results to Commerce for reconsideration. *Productos Laminados de Monterrey S.A. de C.V. v. United States*, 45 CIT __, __, 554 F. Supp. 3d 1355, 1365 (2021) ("*Prolamsa I*"). *Prolamsa I* provides background information on this litigation. *Id.*, 45 CIT at __, 554 F. Supp. 3d at 1356–58.

Commerce submitted its decision in response to *Prolamsa I* on April 7, 2022. *Final Results of Redetermination pursuant to Court Remand*, ECF No. 61-1 ("*Remand Redetermination*"). Defendant-Intervenor Nucor Tubular Products, Inc. ("Nucor") commented in opposition on May 9, 2022. Def.-Int. Nucor Tubular Products, Inc.'s Comments on Remand Redetermination, ECF Nos. 64 (conf.), 65 (public) ("Nucor's Comments").[1] Following Prolamsa's submission of comments in support, Comments in Resp. to Comments on Remand Redetermination (May 24, 2022), ECF Nos. 69 (conf.), 70 (public), defendant replied to the comments, advocating that the court sustain the Remand Redetermination. Def.'s Resp. to Comments on Remand Redetermination (May 26, 2022), ECF No. 71.

---

[1] The information disclosed in this Opinion is included in public versions of record documents, public versions of the parties' submissions, and other information subsequently made public in issuances by Commerce. All citations to record documents are to the public versions of those documents. All citations to "J. App." are to the public version of the Joint Appendix (June 25, 2021), ECF No. 47-1 (public).

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c),[2] pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action contesting a final determination Commerce issued to conclude an administrative review of an antidumping duty order.

In reviewing an agency decision such as the Remand Redetermination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Prolamsa's Claim that the Final Results Were Contrary to Law

In contesting the Final Results, Prolamsa claimed that Commerce unlawfully denied its request for a "level-of-trade" ("LOT") adjustment under section 773(a)(7) of

---

[2] All citations to the United States Code herein are to the 2018 edition and all citations to the Code of Federal Regulations herein are to the 2020 edition.

the Tariff Act, 19 U.S.C. §1677b(a)(7), that would apply to certain of its sales of the

foreign like product in its home market of Mexico.

Plaintiff described its home market ("HM") sales during the period of review

("POR"), September 1, 2017 to August 31, 2018, as having been made through four

channels of distribution, three of which it described as "commercial" sales and one of

which (the "HM Channel 4" sales) it described as "industrial" sales.  As the court stated

in *Prolamsa I*:

> Prolamsa contrasted its HM Channel 4 sales, to which it referred as its
> "industrial" sales, with those sold through its other three channels of
> distribution, to which it referred as its "commercial" sales of HWR pipes
> and tubes, and which it described as follows: direct sales to unaffiliated
> customers from inventory stored at its plants ("HM Channel 1"); direct
> sales to unaffiliated customers from inventory stored at its warehouses
> ("HM Channel 2"); and sales to unaffiliated resellers, which products
> subsequently were resold to unaffiliated home market customers ("HM
> Channel 3").

*Prolamsa I*, 45 CIT at __, 554 F. Supp. 3d at 1360 (citation omitted).  Prolamsa described

its Channel 4 sales as "sales of custom-designed parts that were made from HWR pipes

and tubes and that were produced for, and sold to, original equipment manufacturers

('OEMs')."  *Id.* (citation omitted).

As the court recounted, "Prolamsa argued that all of its U.S. sales were more

similar, in terms of characteristics and selling functions, to its HM Channels 1, 2, and 3

sales, i.e., its 'commercial' sales, than they were to its 'industrial' sales of HM

Channel 4."  *Id.* (citation omitted).  "Prolamsa contended that its U.S. sales should be

compared to HM Channels 1–3, and that HM Channel 4 sales should not be used for

comparison purposes unless sales in HM Channels 1–3 are unavailable, and that in such

an instance Commerce should make a level-of trade adjustment." *Id*., 45 CIT at __,

554 F. Supp. 3d at 1361 (citation omitted).  In reaching the preliminary results of the

second review ("Preliminary Results"), Commerce agreed, finding that Prolamsa had

sold the foreign like product at two levels of trade in the home market.  *Id*. (citation

omitted).  "Commerce used Prolamsa's HM Channel 4 sales for price comparisons with

U.S. sales only when no HM Channel 1, 2, or 3 sales were available for comparison with

U.S. sales, and when it used an HM Channel 4 sale for that purpose, it made an

adjustment, i.e., a reduction, in normal value to account for the difference in level of

trade." *Id*.  In the Preliminary Results, Commerce calculated for Prolamsa a preliminary

weighted average dumping margin of 0.8%.  *Heavy Walled Rectangular Welded Carbon*

*Steel Pipes and Tubes from Mexico: Preliminary Results of Antidumping Duty Administrative*

*Review and Preliminary Determination of No Shipments; 2017–2018*, 84 Fed. Reg. 63,610,

63,610 (Int'l Trade Admin.) ("*Preliminary Results*").  For the Final Results, Commerce

changed its position and treated all home market sales of the foreign like product as

having been made at a single level of trade, which change (along with other changes not

contested in this litigation) resulted in the final weighted average dumping margin of

7.47%.  *Final Results*, 85 Fed. Reg. at 41,963.

### C.  The Court's Decision in *Prolamsa I*

The court identified two shortcomings in the Department's level-of-trade

analysis for the Final Results, both of which involved a finding or conclusion not

supported by substantial evidence on the administrative record of the second review.

First, the court rejected as unsupported by the record evidence the Department's

finding that none of the documents provided by Prolamsa during the second review

proceedings demonstrated what Commerce termed "direct quantitative support" for

Prolamsa's contention that home market sales occurred at two distinct levels of trade.

*Prolamsa I*, 45 CIT at __, 554 F. Supp. 3d at 1362–63.  The court identified in the record

"quantitative data illustrating differences between the staffing and expenses [Prolamsa]

incurred in making its home market 'industrial' sales, i.e., its OEM sales of parts made

from HWR pipe and tube in HM Channel 4, and its sales of standard HWR pipe and

tube in the other three channels," with the former being "proportionally higher by a

substantial amount."  *Id*., 45 CIT at __, 554 F. Supp. 3d at 1362 (citation omitted).  The

court noted, also, that "Prolamsa provided a second set of quantitative data on

inventory turnover to illustrate that the industrial sales involved substantially longer

average inventory turnover periods than the commercial sales."  *Id*., 45 CIT at __,

554 F. Supp. 3d at 1363.

Second, the court found fault with the Department's finding that "the totality of

record evidence contains inadequate support for Prolamsa's LOT claims," *id*. (citation

omitted), a conclusion Commerce described as resulting from its "analytical

framework" under a 2018 change of practice, in which it required quantitative evidence

to support level-of-trade claims.  The court viewed this finding as "entirely conclusory"

and unexplained in light of specific factual findings, which Commerce stated in the

Preliminary Results, that were "grounded in record evidence" and not identified as

reversed or abandoned in the Final Results.  *Id*.  Among those findings were that

Prolamsa had provided documentation "adequately demonstrating that it performed

9 out of 14 selling activities for its HM Channel 4 sales at a high level of intensity."  *Id*.

(citing *Decision Memorandum for the Preliminary Results of the 2017-2018 Administrative*

*Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel*

*Pipes and Tubes from Mexico* 14 (Int'l Trade Admin. Nov. 6, 2019) (P.R. 147, J. App. at 482)

(footnote omitted) ("*Prelim. Decision Mem.*")).  Also among those findings were that

Prolamsa performed certain "OEM-specific" selling activities for its Channel 4

"industrial" sales, which were "sales of custom 'HWR pipe and tube parts,'" that it did

not perform for its commercial sales in the other three channels, which were "of

'standard HWR pipe and tube.'"  *Id*., 45 CIT at __, 554 F. Supp. 3d at 1364 (citing *Prelim.*

*Decision Mem.* at 14, J. App. at 482 (footnote omitted)).  "Commerce found, specifically,

that '[c]ritical to these sales is the successful completion of the Production Parts

Approval Process (PPAP), an industry-specific qualification process that ensures quality

and established processes for OEM customers to certify manufacturers on a custom-

"part" basis.'"  *Id*. (citing *Prelim. Decision Mem.* at 14, J. App. at 482 (footnote omitted)).

### D.  The Remand Redetermination

In *Prolamsa I*, the court directed Commerce to "reconsider its decision finding a

single home market level of trade" and "declining to make a level of trade adjustment."

45 CIT at __, 554 F. Supp. 3d at 1365.  Upon re-examining the record evidence,

Commerce reversed the two findings the court found in *Prolamsa I* to be unsupported

by substantial record evidence.  Commerce stated in the Remand Redetermination that,

in response to the court's order in *Prolamsa I*, it "has reconsidered the facts on the

record" and "finds that Prolamsa made its home market (HM) sales at two LOTs."

*Remand Redetermination* at 1–2.

Among the Department's specific factual findings were that "Prolamsa provided

evidence demonstrating that it performed the selling activities for its HM channel 4

sales at a higher level of intensity than its HM channel 1–3 sales."  *Id*. at 7.  Commerce

highlighted evidence showing that Prolamsa performed unique selling activities to meet

the "PPAP" production qualification requirements of its HM Channel 4 (OEM)

customers.  *Id*. at 7–8.  In addition to qualification activities, Commerce identified

selling activities unique to the Channel 4 sales that pertained to training services,

technical support (including engineering and re-engineering services), after-sales

service, logistical services (including just-in-time delivery and inventory maintenance),

and complex order processing.

Regarding its requirement for "quantitative" evidence to support a claimed

level-of-trade adjustment, Commerce found that "Prolamsa adequately provided

certain quantitative metrics in support of its channel-specific selling functions and

corresponding intensities" and cited a chart showing that "the total indirect selling

expenses Prolamsa incurred for its industrial sales were substantially higher as a

proportion of the revenue earned when compared to its commercial sales." *Id*. at 11

(footnote omitted). "Moreover, the costs Prolamsa incurred for salaries and benefits

paid to its industrial sales team were substantially higher in relation to the revenue

earned on industrial products when compared to the same metric calculated with

respect to Prolamsa's commercial sales." *Id*. (footnote omitted). Commerce found,

further, that "while Prolamsa's industrial sales accounted for a small portion of overall

sales, the corresponding headcount of its industrial sales team represents a higher

percentage of its overall headcount (*i.e.*, covering both of Prolamsa's commercial and

industrial sales teams)." *Id*. (footnote omitted).

### E.  Nucor's Opposition to the Remand Redetermination

In its opposition, Nucor characterizes the Remand Redetermination as "an

overcorrection to the Court's remand order." Nucor's Comments 2. According to

Nucor, "the information on the record is insufficient to justify a LOT adjustment," the

Remand Redetermination "ignores information that fairly detracts from its conclusion," and "Commerce's finding of two LOTs relies on inferences that are vague and conclusory." *Id.*

Nucor bases its "insufficiency" argument on its view that "Commerce failed to connect any differences in the sales expenses—demonstrated by the data the Court highlighted—to a difference in sales prices." *Id.* at 9. Arguing that the burden was on Prolamsa, Nucor asserts that Prolamsa "has not connected" the differences in selling expenses between HM Channel 4 and HM Channels 1–3 to the differences in sales prices between the products in Channel 4 and those of the other three Channels. *Id.* at 12. Nucor submits that differences between the channels as to inventory costs have not been quantified or been shown to contribute to "price incompatibility." *Id.* at 13. According to Nucor, Prolamsa "failed to demonstrate how the difference in sales expenses affected the price differences sufficiently to merit a LOT offset," *id.* at 12, and that "[w]hile there may be differences in the cost of manufacturing to account for the . . . price difference, those costs of manufacturing would be accounted for in a difference in merchandise ('DIFMER') adjustment not a LOT adjustment," which "are not the same thing and should not be treated in the same way," *id.* at 14.

As for its contention that Commerce ignored "information that fairly detracts from its conclusion," *id.* at 2, Nucor argues that "Prolamsa's HM price differences between channels are due to the fact that the more expensive product of HM Channel 4

is custom-made and commands a price premium.  The price differences are not due to

an advanced LOT or additional significant selling activities."  *Id*. at 15.

Finally, Nucor argues that Commerce drew "inferences that are vague and

conclusory" regarding inventory carrying costs and "regarding the reason and relative

weight of the differences in price for Prolamsa HM Channel 4 sales."  *Id*. at 17.

According to Nucor, "[t]he remand redetermination fails to engage with the deficiencies

in that data [*sic*] and does not explain its reasons for departing from its final

determination."  *Id*. at 18.

### F.  The Court Must Sustain the Remand Redetermination

The Tariff Act imposes as a guiding principle that "a *fair comparison* shall be

made between the export price or constructed export price and normal value."

19 U.S.C. § 1677b(a) (emphasis added).  Where, as here, normal value is based on the

price of the foreign like product in the home market (in this case, Mexico), Commerce

determines normal value beginning with the price (often referred to as the "starting

price") "at which the foreign like product is first sold . . . for consumption in the

exporting country, in the usual commercial quantities and in the ordinary course of

trade and, *to the extent practicable, at the same level of trade* as the export price or

constructed export price."  *Id*. § 1677b(a)(1)(B)(i) (emphasis added).  If it is not

practicable to compare the export price or constructed export price with prices in home

market sales made at the same level of trade, it may be necessary for Commerce to

make adjustments to the home market price, i.e., to the "starting price" Commerce uses

in determining normal value, to ensure a fair comparison with export price or

constructed export price.

One of the possible adjustments is a "level-of-trade" adjustment, which

Commerce must make according to 19 U.S.C. § 1677b(a)(7) under certain conditions.

When calculating normal value, Commerce is required to make an upward or

downward adjustment to the starting price "to make due allowance for any difference

(or lack thereof) between the export price or constructed export price" and the starting

price "(other than a difference for which allowance is otherwise made under this

section) that is shown to be wholly or partly due to a difference in level of trade

between the export price or constructed export price and normal value" if both of two

conditions are met.  *Id*. § 1677b(a)(7)(A).

The first condition is met if the difference in the level of trade between the export

price or constructed export price and normal value "involves the performance of

different selling activities."  *Id*. § 1677b(a)(7)(A)(i).  The second condition is met if the

difference in the level of trade between the export price  or the constructed export price

and normal value "is demonstrated to affect price comparability, based on a pattern of

consistent price differences between sales at different levels of trade in the country in

which normal value is determined."  *Id*. § 1677b(a)(7)(A)(ii).  The statute provides that

"[i]n a case described in the preceding sentence, the amount of the adjustment shall be

based on the price differences between the two levels of trade in the country in which

normal value is determined." *Id*.

The issue of "fair comparison" arose in the second review of the Order because

Prolamsa's home market sales were of two distinct types, i.e., the "industrial" sales

made in HM Channel 4, which were of custom-made parts for OEM customers, and the

"commercial" sales of the other three home market channels. In the Final Results, these

higher-priced Channel 4 sales were compared, along with the sales in the other three

channels, to the U.S. sales, which did not include the type of custom-made products

that characterized the sales in HM Channel 4. *See Remand Redetermination* at 13 (". . . we

determine that sales to the HM non-OEM customers (*i.e.*, in HM channels 1 through 3)

during the POR were not made at a different LOT than sales to the United States.").

Nucor objects that the higher prices obtained for the products in the Channel 4 sales

were due to higher costs of manufacturing these custom-made products and "not due

to an advanced LOT or additional significant selling activities," Nucor's Comments 15,

but substantial evidence supported the Department's findings that additional, and

unique, selling activities also characterized these sales and that the sales activities for

Channel 4 sales were associated with expenses that were substantially higher as a

proportion of revenue earned than those of the other three channels. Substantial record

evidence supports the Department's finding that the first condition required for a level-

of-trade adjustment was satisfied, i.e., the difference in the level of trade between the

export price or constructed export price and normal value involved the performance of different selling activities.  19 U.S.C. § 1677b(a)(7)(A)(i).

The second condition for a level-of-trade adjustment is met if the difference in the level of trade between the export price or the constructed export price and normal value "is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined."  *Id*. § 1677b(a)(7)(A)(ii).  Nucor does not contest that the HM Channel 4 sales occurred at higher prices and instead argues that the price premium was due to the higher cost of manufacturing these products and "not due to an advanced LOT or additional significant selling activities."  Nucor's Comments 15. Nucor's insistence that the significantly higher selling expenses had no effect on the relative price differences is entirely speculative, if not illogical.

Nucor's argument that Prolamsa, as well as Commerce, failed to connect the differences in the sales expenses to the difference in sales prices, *id.* at 9, 12, presupposes that the record as a whole does not support the Department's finding, based on the totality of the evidence, that the criterion of 19 U.S.C. § 1677b(a)(7)(A)(ii) was satisfied on this record.  Contrary to the premise underlying Nucor's various arguments, the provision, while requiring a finding of a "pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined," does not require the type of particularized analysis Nucor is demanding.

On this record, which contained qualitative and quantitative data showing different selling activities and significantly higher selling expenses, Commerce was presented with record evidence that, considered on the whole, allowed it to find that the criterion of 19 U.S.C. § 1677b(a)(7)(A)(ii) had been met.  Nucor's view that Commerce ignored detracting evidence and drew conclusory inferences is, therefore, misguided. Commerce permissibly could conclude on this record that a LOT adjustment was required to satisfy the statutory obligation to ensure a fair comparison between export price or constructed export price and normal value.  *See Remand Redetermination* at 13 ("In instances where we were unable to make price-to-price comparisons at the same LOT (*i.e.*, comparisons involving OEM sales in HM channel 4), we made an LOT adjustment.").

Nor is the court convinced by Nucor's argument that Prolamsa could have pursued a DIFMER adjustment but is not entitled to a LOT adjustment.  Defendant argues that Nucor did not exhaust its remedies by presenting this argument during the review.  Def.'s Resp. 10.  Because Nucor's argument is baseless, the court need not consider the exhaustion requirement.  Nothing in the Tariff Act or the Department's regulations provides that Prolamsa's not pursuing a DIFMER adjustment precludes its receiving a level-of-trade adjustment, should the statutory criteria for a LOT adjustment be satisfied, as they were on this record.

## III. Conclusion

The Department's decision to employ a level-of-trade adjustment to achieve a fair comparison between export price or constructed export price, and normal value, was based on findings and conclusions supported by substantial evidence on the record of the second review.  Therefore, the court will enter judgment sustaining the Remand Redetermination.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated:  July 6, 2022
          New York, New York